United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LINDA DOLAN,

        Plaintiff,

    v.

PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

        Defendant.

_____/

No. C 11-1562 PJH

**ORDER GRANTING AND DENYING
MOTIONS FOR JUDGMENT**

    The parties' cross-motions for judgment came on for hearing before the court on
April 4, 2012. Plaintiff Linda Dolan ("plaintiff" or "Dolan") appeared through her counsel,
James Keenley. Defendant Prudential Insurance Company of America ("Prudential" or
"defendant") appeared through its counsel, Linda Lawson. Having read all the papers
submitted and carefully considered the relevant legal authority, the court hereby GRANTS
defendant's motion for judgment, and DENIES plaintiff's cross-motion for judgment, for the
reasons stated at the hearing, and as follows.

**BACKGROUND**

    This is an ERISA case, challenging the denial of payment of long term disability
insurance benefits. Plaintiff Linda Dolan was employed by law firm Farella Braun and
Martel LLP ("Farella Braun") as a secretarial/word processing manager. Plaintiff was a
participant in the Farella Braun Long Term Disability Plan ("the Plan"), an employee welfare
benefit plan governed by ERISA, and insured under Group Policy No. 2955, issued by the
Prudential Insurance Company of America ("Prudential"). Plaintiff ceased working at
Farella Braun on February 4, 2008. See Administrative Record ("AR") PRU00980.

United States District Court

For the Northern District of California

A.    The Relevant Policy Terms

The Plan contains the relevant insuring provisions covering total disability benefits. The Plan's relevant language provides:

"You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury;

- you are under the regular care of a doctor.

See AR PRU00031.

"Regular Occupation" is furthermore defined in the Plan under a provision that states: "Regular occupation means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." See id.

The Plan also contains a limitation on benefits provision. Specifically, after 24 months of benefit payments, a participant is considered disabled when "Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." See id.

B.    Background Facts

    1.    Plaintiff's Medical Condition and Initial Approval of Benefits

Prior to 2008, plaintiff was employed as Manager of the Secretarial, Reception, and Word Processing Departments for Farella Braun. See AR at PRU00081. The Farella Braun job description for plaintiff's position described the following duties associated with the position: supervision performance evaluations, compensation recommendations and hiring within plaintiff's departments; and supervising the day to day activities of up to sixty secretaries, eight word processing employees, and four receptionists. See AR at PRU00563-65. In order to execute her duties, plaintiff contends she performed tasks that

United States District Court

For the Northern District of California

1  included: using email and telephone to coordinate activities, attend meetings with attorneys

2  and other staff, assist staff in solving problems as they arose during the day, and generally

3  perform the work necessary to support a robust litigation practice.  AR at PRU00082-85.

4      Plaintiff was forced to stop working in February 2008 due to "pain in neck, shoulder,

5  right arm, wrist, hand."  AR at PRU00980-81.  In April 2008, plaintiff submitted a claim for

6  long term disability benefits, reporting that this condition interfered with her ability to

7  perform her job.  Id.  Plaintiff generally contends that she suffered (and continues to suffer)

8  from the combined effects of two distinct medical conditions and their attendant effects.

9  One condition encompasses diseases and disorders of the cervical spine, including

10  degenerative disc disease and cervical radiculopathy.  The second condition is Thoracic

11  Outlet Syndrome, which includes pain, fatigue, and significantly reduced grip strength in the

12  upper extremities.

13      Plaintiff's claim identified her primary care physician as Dr. Timothy Murphy, and

14  further identified her treating physiatrist, Dr. Holly Kelly.  On May 7, 2008, Dr. Murphy

15  provided a primary diagnosis of degenerative disc disease, and a secondary diagnosis of

16  chronic neck pain.  AR at PRU00979.  He noted that it was very difficult for plaintiff to sit

17  more than 30 minutes, or to bend or reach.  Id.  He also noted that plaintiff was not capable

18  of any work at present, but that plaintiff's prognosis for a return to work was excellent, and

19  that a target return date was June 15, 2008.  AR at PRU00978.  Dr. Kelly, for her part,

20  reported that plaintiff "has some mild degenerative disc disease, possibly underlying carpal

21  tunnel syndrome and ulnar neuropathy."  AR at PRU00957.  On April 2, 2008, plaintiff's

22  physical therapist had also conveyed a summary to Dr. Kelly, in which the therapist listed a

23  diagnosis of "cervical DDD w/ myofascial pain" and noted that plaintiff had described a 10

24  year history of cervical pain.  AR at PRU00968.

25      Prudential requested that nurse Maliea Brackett conduct a medical review of office

26  visit notes from Dr. Kelly, as well as physical therapy notes.  Nurse Brackett concluded in a

27  June 6, 2008 analysis that it would be reasonable that plaintiff could not sustain even part

28

3

United States District Court

For the Northern District of California

1   time sedentary activity due to ongoing pain and decreased range of motion.  See AR at

2   PRU00994.  Nurse Brackett then recommended that Prudential follow up with plaintiff in

3   three to four months.

4         On June 6, 2008, Prudential informed plaintiff that it had approved her claim for long

5   term disability benefits, effective May 5, 2008.  See id. at PRU001169-70.

6         2.    Post-Approval Medical History

7         On June 18, 2008, plaintiff sent Prudential an undated Vocational Rehabilitation

8   Education and Employment History Form.  AR at PRU00948-52.  Plaintiff noted therein that

9   she was working toward a psychology degree at "USF, Dominican University."  See id. at

10  PRU00931.

11        On July 23, 2008, plaintiff underwent a right-sided C5-C6 posterior microdiscectomy

12  and C5-C6 foraminotomy, performed by a surgeon, Dr. Andrews, who provided a

13  postoperative diagnosis of cervical disk disease, C5-C6, right.  AR at PRU00936.  On

14  September 15, 2008, Dr. Andrews reported that plaintiff had "excellent strength and

15  sensation" and on September 26, Dr. Kelly reported that Dr. Andrews had cleared plaintiff

16  to "activity as tolerated."  AR at PRU00915.

17        On October 10, 2008, plaintiff reported to Prudential that she had started physical

18  therapy twice weekly but that things were "moving slowly."  AR at PRU001058.  Plaintiff

19  stated that the surgery helped her in one area in which she had tremendous pain but that

20  she still had "rom issues [and] pain issues that were there before surgery."  Id.  Plaintiff also

21  reported that she could not hold her purse because of shoulder pain and the weight of the

22  purse.  Id.  Plaintiff was not, however, on any pain medication.  Id.

23        On October 20, 2008, plaintiff completed a questionnaire in connection with her

24  physical therapy, in which she reported having moderate pain and being unable to do her

25  "usual work" because of her neck.  AR at PRU00904.  Plaintiff indicated that she could

26  driver her car without any neck pain, and that she could "manage light to medium weights if

27  they are conveniently positioned."  Id.

28

United States District Court
For the Northern District of California

1    In November 2008, plaintiff completed a questionnaire regarding her activities of

2    daily living.  Plaintiff stated that she was recovering from surgery, and that progress was

3    "slow," with plaintiff still "experiencing pain daily."  AR at PRU00877.  She did acknowledge,

4    however, "some improvements in strength and mobility."  Id.  She reported: she drives, but

5    not generally for travel more than 30 miles; shops for food weekly for about an hour, using

6    a basket; takes continuing education courses; walks and does physical therapy exercises;

7    takes classes and attends school weekly; and talks on the phone daily.  AR at PRU00879-

8    82.

9    On December 23, 2008, physical therapist Elyse Tomasello reported that plaintiff

10    had "significantly improved" in her "ULNTT, elbow and wrist ranges of motion," further

11    noted that plaintiff's "right C6 dermatome is now intact and symmetrical to the left," and that

12    plaintiff would "benefit from continued physical therapy to return to her prior level of

13    function."  AR at PRU00858, 861.  Tomasello did note that plaintiff "does have

14    parasthesia."  Id.

15    Several months later, during a January 14, 2009 call, plaintiff reported to Prudential

16    that she develops "pain and numbness" after sitting for "maybe 30 minutes" at a computer,

17    and that she needs to switch the phone from hand to hand so that her arm does not go

18    numb, and talks for 5-10 minutes at most.  AR at PR001061.  Asked about whether she

19    could return to work, plaintiff claimed that she spent almost all her time "in front of the

20    computer" and did not know how she could "limit that type of activity and still get work

21    done."  Id.  Plaintiff also noted, however, that she had spoken to her boss the week before,

22    and was "confident [she] was going back in April," though she could not say whether it

23    would be full or part time.  Id.

24    At Prudential's request, nurse Janice Wyman reviewed plaintiff's updated medical

25    records, and on January 16, 2009, found that plaintiff "continues to have limitations

26    secondary to right upper extremity weakness and pain following surgery in July 2008."  AR

27    at PRU00999-1000.  Nurse Wyman found it reasonable that plaintiff "would not likely be

28

5

United States District Court

For the Northern District of California

1    able to sustain bilateral upper extremity activity at this time," and recommended that

2    Prudential follow up with plaintiff in two months regarding her activities and limitations, and

3    obtain updated physical therapy and orthopedist notes to better understand plaintiff's

4    response to and changes in treatment.  See AR at PRU01000.

5           On February 9, 2009, plaintiff saw Dr. Kelly for a follow up evaluation.  Dr. Kelly

6    noted that plaintiff had "no progressive symptoms since her last visit," that her strength

7    testing was "5 out of 5" with respect to upper extremities, and that sensation was intact."

8    AR at PRU00830.  Dr. Kelly recommended that plaintiff limit her "overhead lifting activities"

9    and her "repetitive upper extremity lifting and gripping, grasping activities," as plaintiff would

10   have to make position changes every hour or so to avoid static posturing.  Id.

11          On April 7, 2009, Dr. Kelly reported that plaintiff had noted "relief" following epidural

12   injunctions, and further found that this relief represented "quite significant improvement ...

13   in that it is attributable to approximately 50% of her total pain."  See AR at PRU00831.

14   Plaintiff had reported to Dr. Kelly that she had "a hard time sitting and studying and working

15   on the computer for long periods."  Id.  Dr. Kelly then noted that "it seems that the majority

16   of the radicular pain resolved," and that what remained "in the cervical area is myofascial

17   type pain."  Id. at PRU00832.

18          During an April 24, 2009 telephone interview, plaintiff informed Prudential that she

19   had been talking with her "boss," that "they want[ed] to replace [plaintiff]," and plaintiff

20   therefore wanted to know "how that might impact [her] claim."  AR at PRU001062.  Plaintiff

21   also reported that she was released from physical therapy because she was not

22   progressing.  Id. at PRU001063.  Plaintiff noted that while she must sit through classes she

23   was taking, she can stand if needed and there is usually a break during a "long 2 hour

24   class."  Id. at PRU001064.

25          3.    Prudential Recommends Further Review and Direct Observation

26          On April 28, 2009, a Prudential claim manager noted inconsistencies in plaintiff's file

27   regarding her functionality, and recommended direct observation in order to better

28

6

United States District Court

For the Northern District of California

1    understand plaintiff's functionality, followed by a file review.  See AR at PRU001002.

2         The next day, on April 29, 2009, Nurse Wyman conducted a further review.  Nurse

3    Wyman found, based upon plaintiff's reported activities, that "there does not appear to be

4    any limitations regarding walking or standing."  Id. at PRU001003.  She further noted that

5    plaintiff "uses her computer for limited times and has difficulty sitting for long periods due to

6    development of neck and left upper extremity pain," and also that "exam shows good

7    strength in upper extremities but [plaintiff] does have muscle spasms and had just recently

8    been prescribed muscle relaxants."  Id. at PRU001004.  Nurse Wyman concluded that "it

9    appears claimant would have some functional capacity... however, it is not entirely clear

10   what she would be capable of sustaining at this time."  Id. at PRU001004.

11        On May 21-24, and May 26, 2009, Prudential requested that third party Research

12   Consultants Group., Inc. ("RCG") conduct surveillance of plaintiff, resulting in a written

13   report and video.  See AR at PRU00806-17; PRU001200-02.  RCG did so, and its report

14   noted that plaintiff "conducted her activities in what appeared to be a normal fashion

15   without any apparent physical difficulty."  Id. at PRU00806-16.  The report noted: that on

16   four of the five days, plaintiff walked at least approximately three miles, removing her

17   sweatshirt and tying it around her waist; plaintiff drove to a shopping center, carried a

18   shopping bag and a purse, and remained in the shopping center approximately two hours

19   later; walked to a coffee shop, sat on a bench for 17 minutes, while turning her head left

20   and right and up and down; spent 22 minutes grocery shopping, while reaching and picking

21   up various items with both arms; and generally was observed eating, drinking, talking on a

22   cell phone, and appearing to move "in a normal fashion without any difficulty."  See id.

23        Linda Campos, RN, conducted a file review based upon the surveillance video

24   results.  In a June 16, 2009 analysis Nurse Campos concluded that, based on the video,

25   she would not expect "any limitations or restrictions as it relates to sitting activities."  AR at

26   PRU01008.  Nurse Campos also said, "based on the activities as noted," she would expect

27   that plaintiff "has at least sustainable light capacity of not greater on a full time basis."  Id.

28

United States District Court

For the Northern District of California

1    On June 17, 2009, following the foregoing reports, Prudential informed plaintiff that it

2    had determined no benefits were payable beyond that date, and that plaintiff's claim was

3    being closed effective June 18, 2009.  See AR at PRU01149.  Prudential's decision cited

4    reliance upon Dr. Kelly's records, plaintiff's self-reported activity, and the surveillance video.

5    Id. at PRU01150.

6        4.    Plaintiff's First Appeal

7    On December 10, 2009, plaintiff appealed Prudential's decision.  AR at PRU00595-

8    96.  In doing so, she submitted additional medical information from earlier medical

9    consultations.

10    First, plaintiff submitted the results of an earlier neurological consultation with Dr.

11    Donald Kitt.  Dr. Kitt reported that plaintiff had full muscle strength in "all proximal and distal

12    groups," but complained of "some discomfort from maximal testing of all proximal and distal

13    upper extremity muscles."  AR at PRU00653.  He noted that plaintiff's cervical range of

14    motion was "mildly limited."  He had also recommended repeat electrodiagnostic evaluation

15    by a neuromuscular expert, Dr. Robert Miller.

16    Dr. Miller performed electrodiagnostic studies on October 14, 2009, and found no

17    evidence of thoracic outlet syndrome of the neurogenic type, nor evidence of ulnar

18    neuropathy or other compressive neuropathy or radiculopathy.  AR at PRU00642.

19    On October 22, 2009, Dr. Kitt reported to Dr. Kelly that Dr. Miller's evaluation was

20    said "to reveal normal nerve functions...".  Id. at PRU00650.  Dr. Kitt reported that plaintiff

21    "had diffuse muscoloskeletal complaints without evidence of an underlying neurological

22    condition," and returned plaintiff to Dr. Kelly's care.  Id.

23    On October 26, 2009, Dr. Kelly reported that plaintiff's "most limiting factor"

24    continued to be "abnormal muscle contractures termed myofascial pain syndrome," which

25    is a "fairly common sequela from her multiple neurologic issues and disc degeneration."

26    See id. at PRU00741.  Dr. Kelly further opined that plaintiff's pain made it so that plaintiff

27    was "unable to do long periods of sitting in one position, long periods of upper body motion,

28

United States District Court
For the Northern District of California

long periods of overhead activities meaning anything greater than 10-15 minutes" and that plaintiff was "required to change positions constantly."  Dr. Kelly found it "reasonable" that plaintiff "will continue to be quite limited with regular day to day functioning."  AR at PRU00742.

On November 24, 2009, physical therapist Tomasello wrote, opining that plaintiff, in the surveillance videos, was merely following Tomasello's instructions to "walk for exercise."  See AR at PRU00616.  Tomasello noted that she had treated plaintiff from September 2008 to January 2009.  Id.

On December 3, 2009, Alan Nelson, a vocational evaluation specialist, conducted a Functional Capacity Evaluation ("FCE") for plaintiff in order to measure plaintiff's tolerances for work activities.  The FCE demonstrated that plaintiff was significantly impaired in her ability to use her upper extremities, and Nelson concluded:  that plaintiff would have potential physical tolerance problems performing her previous Manager occupation, and that her range of motion and upper extremity pain would "limit her ability to perform fast-paced business/clerical occupations that involve frequent data entry, writing, long term sitting or repetitive range of motion activities.  See AR at PRU00353-58.

In a December 9, 2009 report, neurologist Dr. Tracy Newkirk stated that he had seen plaintiff twice in the past two months, in order "to review her history of disability and to evaluate the current states of that established disability. AR at PRU00617.  Dr. Newkirk provided 6 diagnoses: (1) cervical degenerative disc and foraminal disease, post right microdiscectomy; (2) bilateral thoracic outlet syndrome; (3) bilateral periscapular weakness; (4) neuropathic pain syndrome with referral to the neck, shoulders and hands; (5) migraine due to TOS; and (6) bilateral, focal, acquired dystonia of both hands and probably the feet.  Id. at PRU00620.  Dr. Newkirk also employed functional grip testing, and concluded that plaintiff "is currently unemployable and will remain so for an indefinite period of time due to the neurovascular compromise demonstrated by the clinical examination and functional grip testing."

United States District Court

For the Northern District of California

Dr. Newkirk provided several work "preclusions," including:  no lifting and carrying over 5 pounds frequently or continuously and no lifting or carrying over three pounds frequently or continuously; no reaching or working above shoulder level; limitations (to 15 minutes no more than 4 times a day) on reaching forward as to typing, driving, cooking, or doing fine, repetitive or bilateral repetitive hand activities; restrictions on sitting to 30 minute segments no more than 6 times per day, interspersed with walking or lying down in order to recover; no looking down continuously; and instructions to avoid repetitive turning of the head to either side (adding to driving limits).  AR at PRU00623.

Plaintiff also submitted an FCE report indicating that she: attended Dominican University on a daily basis, where she takes 1.5 to 4 hours of classes from mid-afternoon into the evening; that plaintiff experiences back discomfort after 30-60 minutes, and then alternates to standing for 10 minutes before returning to another 30-60 minute sitting task. AR at PRU00631.  Plaintiff also reported experiencing "soreness and cramping" in her right hand after writing for 10 minutes or less, a constant problem that has to be accommodated "when taking notes in her academic classes." Id.  Plaintiff also reported feeling pain during cervical spine and lumbar spine tests, although the active range of motion was 100% of "normal" in all movements. Id. at PRU00632-33.

On January 20, 2010, Dr. Richard S. Kaplan submitted an independent physician review of the file (i.e., a peer review report), and concluded that plaintiff "has a mild degree of functional impairment from a physical standpoint as of the date of 6/18/09 forward, based upon her surgical history."  AR at PRU00450, 453.  He found, based on the documentation in the file: "conflicting reports" of mild motor or sensory deficits with no clear functionally significant neurological or musculoskeletal findings; "subjective pain" reports from plaintiff in connection with cervical spine and upper extremities, with "no clear anatomical basis" for such findings; that the surveillance video demonstrated plaintiff performing daily activities "without any apparent substantial physical impairment;" and that the FCE did "not demonstrate any specific objective restrictions/limitations." Id.

United States District Court

For the Northern District of California

1    Given plaintiff's surgical history, Dr. Kaplan provided permanent

2  "restrictions/limitations" as follows: only occasional overhead reaching and overall

3  lifting/carrying up to 10 pounds frequently or 20 pounds occasionally as well as changing

4  positions for one minute each hour sitting; and no further restrictions on sitting, standing,

5  walking, reaching at and below shoulder level as well as performing repetitive and fine

6  motor hand activities.  Id. at PRU00451-52.

7    Dr. Kaplan's restrictions are consistent with the report by a vocational analysis on

8  January 22, 2010, stating that plaintiff's regular occupation is sedentary, requiring lifting up

9  to 10 pounds occasionally, frequently sitting, occasionally standing/walking, frequent

10  reaching, handling and fingering, and occasional reaching at shoulder height or above.  AR

11  at PRU01016.

12    On January 25, 2010, Prudential informed plaintiff that it had completed its review,

13  and upheld its decision to terminate plaintiff's claim.  See id. at PRU01138-43.

14    5.    Plaintiff's Second Appeal

15    Plaintiff requested a second appeal on June 16, 2010.  Plaintiff cited a June 9, 2010

16  report from Dr. Newkirk, and an April 5, 2010 report from vocational consultant Alan

17  Nelson, in support of the appeal.

18    Dr. Newkirk's June 9 report opined that plaintiff's "decline would accelerate" if she

19  attempted "the level of work anticipated by Dr. Kaplan."  He also changed his prior

20  conclusion that plaintiff would remain unemployable for "an indefinite period of time" to

21  state that she would remain unemployable "permanently.  See AR at PRU00411; cf.

22  PRU00623.  Dr. Newkirk's report appeared to be based on the same two visits with plaintiff

23  that Dr. Newkirk had earlier reported on in his December 9, 2009 report.

24    In an April 5, 2010 report, vocational consultant Alan Nelson summarized a March

25  18 interview with plaintiff about her job at Farella Braun.  Nelson based his conclusion in

26  part on plaintiff's subjective reports of her work activities and adult living activities, and

27  concluded that plaintiff "does not exhibit the physical tolerances and mental stamina to

28

United States District Court
For the Northern District of California

1   maintain appropriate pace and persistence in the job of secretarial or office manager."  AR

2   at PRU00421.

3          Prudential attempted to schedule an independent medical exam (IME), but these

4   efforts ultimately proved futile.  After plaintiff objected to the first examiner, Prudential

5   attempted to schedule subsequent IMEs with another examiner, but due to the examiner's

6   scheduling error and a sickness, the IME was never held within the applicable time frame.

7          Dr. Kaplan conducted a further independent file review on October 4, 2010, following

8   his review of plaintiff's additional medical records.  Dr. Kaplan found that his prior

9   assessment was not altered.  He questioned some of the techniques – and conclusions –

10  reached by Dr. Newkirk in his evaluation of plaintiff, and noted that while he accepted the

11  diagnosis of thoracic outlet syndrome, the MRI and other radiograph could not establish an

12  impairment.  AR at PRU00226.  He concluded that some form of full time employment

13  would likely be both possible and therapeutic.  Id.

14         By letter dated October 8, 2010, Prudential upheld its decision to cease benefits and

15  close plaintiff's file.  AR at PRU01097-1105.[1]

16  C.     Instant Motion

17         Plaintiff filed the instant action against Prudential and the Plan on March 31, 2011.

18  The Plan was dismissed from the action on April 26, 2011, and February 2, 2012, the

19  parties stipulated to dismiss a claim for breach of fiduciary duty that had been stated in the

20  complaint.  Thus, the complaint now alleges a single cause of action under ERISA, as to

21  Prudential only.  See generally Complaint.

22         Before the court are the parties' cross-motions for judgment pursuant to Federal

23  Rule of Civil Procedure ("FRCP") 52.[2]

24  ─────────────────────

25         [1]     The parties also do not dispute that plaintiff applied for Social Security benefits,
     and was denied.

26         [2]     Although the parties have filed cross-motions pursuant to FRCP 52, the parties
27  conceded at the hearing on the motions that they are seeking resolution of all issues and
     factual disputes, in the same manner as usually sought by way of summary judgment motions
28  filed pursuant to FRCP 56.  Accordingly, the court will analyze the parties' cross-motions

**DISCUSSION**

A.    Legal Standard

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where an ERISA action claiming wrongful denial of benefits is reviewed under a de novo standard on summary judgment, the court must determine whether benefits were correctly denied based on the evidence in the administrative record.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006)(en banc).  The court must grant summary judgment if the administrative record reveals no genuine issue of material fact.

B.    Legal Analysis

In order to properly evaluate plaintiff's denial of benefits by Prudential, the following issues require resolution:  (1) whether plaintiff was disabled under the "regular occupation" provision of the Plan, as of June 18, 2009 (the date that the Plan ceased paying benefits); and (2) whether, if so, plaintiff was disabled under the "any occupation" provision of the Plan as of May 5, 2010 up to the present.[3]

Preliminarily, the parties dispute at the outset the parameters applicable to the evidentiary "universe" to be considered by the court.  Plaintiff first contends that the court should decline to consider (a) Prudential's October 8, 2010 letter upholding its decision to

_____

pursuant to the standards applicable to motions brought under FRCP 56, in order to determine whether judgment should be entered pursuant to FRCP 52.

[3]    As the parties previously agreed that the appropriate standard of review to be applied by the court is de novo review, the court's role in assessing the foregoing is to "evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest."  See, e.g., Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  end benefits in response to plaintiff's second appeal; and (b) Dr. Kaplan's October 4, 2010

2  report conducting a further file review in response to the second appeal and responding to

3  Dr. Newkirk's assessment in connection with the same.  Plaintiff's grounds for excluding

4  this evidence is that Prudential missed the 90 day Plan imposed deadline to respond to

5  plaintiff's appeal, and as such, the claim was deemed denied under the terms of the Plan.

6  Since no post-denial evidence is permitted under <u>Jebian v. Hewlett-Packard</u>, 349 F.3d

7  1098 (9th Cir. 2003), plaintiff asserts that exclusion is warranted.  Defendant, for its part,

8  disputes plaintiff's reasoning on this front, and furthermore contends that certain of

9  plaintiff's own exhibits – specifically, Exhibits 20 and 29 to the Keenley Declaration and

10 exhibits A, B, and C to plaintiff's appendix of other authorities – should be excluded from

11 consideration on grounds that these documents are not part of the underlying

12 administrative record.

13        Having reviewed the parties' arguments, the court DENIES plaintiff's request to

14 strike Prudential's October 8, 2010 letter confirming denial of benefits or Dr. Kaplan's

15 October 4, 2010 report.  Plaintiff's reliance on <u>Jebian</u> is misplaced, as <u>Jebian</u> directly

16 considered the question of what effect a "deemed denied" decision has on the standard of

17 review, a distinct issue from the one presented here (i.e., whether a "deemed denied"

18 provision prevents the court from considering an insurer's denial and reasons therefore, if

19 provided subsequent to the "deemed denied" date).  Furthermore, <u>Jebian</u>'s stated rationale

20 – that a rule that permits courts to ignore "deemed denied" language in the Plan would

21 allow claimants, who are entitled to sue once a claim had been "deemed denied," to be

22 "sandbagged" by a rationale that the Plan administrator adduces only after the suit has

23 commenced – is not applicable here.  Prudential issued its denial letter and Dr. Kaplan's

24 report less than one month after the 90 day deadline had lapsed, and more than 6 months

25 prior to the date plaintiff filed the instant action.  In these circumstances, there can be no

26 claim that plaintiff was "sandbagged" by defendant.  Moreover, the court notes that Dr.

27 Kaplan's report was, in fact, conducted in order to take into account and respond to the

28

United States District Court

For the Northern District of California

1    evidence submitted in support of plaintiff's second appeal.  As such, to ignore the foregoing

2    evidence when Prudential made an apparently good faith effort to provide a reasoned

3    decision in response to plaintiff's second appeal (irrespective whether that reasoned

4    decision is accurate), would prove inequitable.

5         As to whether plaintiff has inappropriately attempted to supplement the

6    administrative record with Exhibits 20 and 29 to the Keenley Declaration and exhibits A, B,

7    and C to plaintiff's appendix of other authorities, the court finds defendant's objections well

8    taken.  It is undisputed that these documents are not a part of the underlying administrative

9    record.  Moreover, plaintiff provides no adequate showing as to why the administrative

10   record should be supplemented at this late date.  Accordingly, the court excludes these

11   documents from consideration.

12        Having disposed of the foregoing preliminary matters, the court now turns to the

13   merits of the parties' arguments.

14        1.   Whether Plaintiff was Disabled Under the "Regular Occupation" Provision as
             of June 18, 2009

15

16        The critical issue to be resolved is whether plaintiff was disabled under the Plan as

17   of June 18, 2009, the date that Prudential determined that benefits were no longer payable

18   to plaintiff.  The Plan provides that an employee is "considered disabled" if he or she is

19   "unable to perform the material and substantial duties of your regular occupation due to

20   your sickness or injury."  AR at PRU00031.  Thus, if plaintiff was unable to perform the

21   "material and substantial" duties of her occupation as a secretarial and word processing

22   manager as of June 18, 2009, plaintiff was entitled to LTD benefits as of that date, up

23   through the end of the relevant benefits limitation period.

24        Plaintiff asserts her disability via two diagnostic impairments: a cervical impairment

25   that includes degenerative disc condition among other things; and thoracic outlet syndrome

26   ("TOS").  Whether based on either or both conditions, plaintiff's claim of a physical disability

27   is rooted in her inability to utilize her upper extremities for repetitive or long-ranging tasks,

28

United States District Court

For the Northern District of California

1    and her inability to sit and work for long periods of time.

2         As a preliminary matter, the parties dispute the relevant definition to be applied to

3    plaintiff's "regular occupation." Plaintiff contends that her "regular occupation" requirements

4    and duties should be defined with respect to her practical and actual day to day duties and

5    experiences, while defendant contends that plaintiff's "regular occupation" should be

6    defined with respect to Farella Braun's stated job description. The Plan itself expressly

7    states that: "Regular occupation means the occupation you are routinely performing when

8    your disability begins. Prudential will look at your occupation as it is normally performed

9    instead of how the work tasks are performed for a specific employer or at a specific

10   location." See AR at PRU00031. Thus, in assessing the duties and requirements of

11   plaintiff's occupation, the court is to be governed by those applicable duties and tasks that

12   pertain to the general role of secretarial manager, not by a description of duties and/or

13   tasks that reflect individual requirements specific or particular to Farella Braun.

14        The court's review of the administrative record discloses that plaintiff's occupation of

15   secretarial/word processing manager has the following generally applicable classification

16   and duties: it is a "sedentary" position; requires lifting 10 pounds occasionally, frequently

17   sitting and occasionally standing/walking; does not preclude opportunities to stand/stretch

18   for brief periods while sitting; requires frequent reaching, handling and fingering, with

19   shoulder height or above reaching being only occasional. AR at PRU01016. In terms of

20   overall responsibilities, plaintiff's position requires: overseeing secretarial and reception

21   services, administration, payroll, conference planning and travel, information and data

22   processing, mail, materials scheduling and distribution, printing and reproduction, records

23   management, telecommunication management, security, parking, energy consumption, and

24   personal property procurement, supply recycling and disposal. Id.

25        With this in mind, the relevant question for the court is whether plaintiff was unable

26   to perform the material and substantial duties of her occupation as of June 18, 2009.

27   Plaintiff supports her claim that her cervical issues and/or TOS rendered her unable to

28

perform the material functions of her occupation with evidence of the following:

- plaintiff experiences significant pain and weakness when using her upper extremities, and so cannot use a computer or sit and work at a desk for a time period sufficient to meet the requirements of a full-time office job, a fact well documented by her treating physicians, including Dr. Kelly, and supported by the initial Prudential review that concluded that initial benefits were appropriate;

- plaintiff's July 2008 surgery and subsequent treatment, which further demonstrated that plaintiff progressed only "slowly" and eventually was released from physical therapy for failure to progress;

- that in fall of 2009, Dr. Kelly opined that plaintiff's pain made it so that plaintiff was "unable to do long periods of sitting in one position, long periods of upper body motion, long periods of overhead activities meaning anything greater than 10-15 minutes" and that plaintiff was "required to change positions constantly;"

- that vocational evaluation specialist Alan Nelson, in his December 2009 FCE, determined that plaintiff was significantly impaired in her ability to use her upper extremities and that her range of motion and upper extremity pain would "limit her ability to perform fast-paced business/clerical occupations that involve frequent data entry, writing, long term sitting or repetitive range of motion activities;

- that in a December 2009 report, neurologist Dr. Tracy Newkirk also opined that he had seen plaintiff twice in the past two months, and had diagnosed her with TOS and degenerative disc disease among other things;

- that Dr. Newkirk employed functional grip testing, and concluded that plaintiff "is currently unemployable and will remain so for an indefinite period of time due to the neurovascular compromise demonstrated by the clinical examination and functional grip testing;" and

- that Dr. Newkirk had provided several work "preclusions," including no lifting and carrying over 5 pounds frequently or continuously and no lifting or carrying over three pounds frequently or continuously; no reaching or working above shoulder level; limitations (to 15 minutes no more than 4 times a day) on reaching forward as to typing, driving, cooking, or doing fine, repetitive or bilateral repetitive hand activities; restrictions on sitting to 30 minute segments no more than 6 times per day, interspersed with walking or lying down in order to recover.

See, e.g., AR at PRU00623-40, PRU00741-42, PRU00957, PRU00994, PRU01058.

1  Plaintiff asserts that the foregoing collectively establishes that plaintiff was unable to

2  perform her regular occupation – which required extended sitting; typing; lifting 10 pounds

3  occasionally; occasionally standing/walking; and frequent reaching, handling and fingering

4  – as of June 18, 2009.

5       Defendant, however, would have the court take into account the following:

6  •    on February 9, 2009, Dr. Kelly noted that plaintiff had "no
       progressive symptoms since her last visit," that her strength testing
7      was "5 out of 5" with respect to upper extremities, that sensation
       was intact," and further recommended that plaintiff limit her
8      "overhead lifting activities" and her "repetitive upper extremity lifting
       and gripping, grasping activities" – as plaintiff would have to do
9      position changes every hour or so to avoid static posturing;

10 •    that on April 7, 2009, Dr. Kelly reported that plaintiff had noted
       "relief" following epidural injunctions, and further found that this
11     relief represented "quite significant improvement ... in that it is
       attributable to approximately 50% of her total pain," although
12     plaintiff did report to Dr. Kelly that she had "a hard time sitting and
       studying and working on the computer for long periods;"
13
   •    that the surveillance video captured in May 2009 depicted plaintiff
14     sitting, walking and driving for long stretches of time, as well as
       going grocery shopping and reaching for things;
15
   •    that Prudential's Nurse Campos conducted a file review on June
16     16, 2009 based on the video and concluded that she would not
       expect "any limitations or restrictions as it relates to sitting
17     activities;"

18 •    that Dr. Richard S. Kaplan's independent physician review of all the
       evidence on file – including Dr. Newkirk's report and analysis –
19     concluded that plaintiff "has a mild degree of functional impairment
       from a physical standpoint as of the date of 6/18/09 forward;"
20
   •    Dr. Kaplan also concluded that there were "conflicting reports" of
21     mild motor or sensory deficits with no clear functionally significant
       neurological or musculoskeletal findings as well as "subjective pain"
22     reports from plaintiff in connection with cervical spine and upper
       extremities, with "no clear anatomical basis" for such findings;
23
   •    that Dr. Kaplan reviewed the surveillance video and believed it
24     demonstrated plaintiff performing daily activities "without any
       apparent substantial physical impairment;" and that the FCE did
25     "not demonstrate any specific objective restrictions/limitations;" and

26 •    and that the Social Security Administration denied plaintiff's claim
       for disability.
27

28

18

United States District Court

For the Northern District of California

1     See, e.g., AR at PRU00830-31, PRU01201-02, PRU00451-52, PRU00223-28,

2   PRU00796-801.

3        Having reviewed the evidence, the court finds that the parties' competing positions

4   are almost equally supported, and the parties' dispute boils down to competing

5   medical/therapeutic opinions and objective evidence.  On the one hand, for example,

6   plaintiff largely relies on the opinions of Dr. Newkirk and Alan Nelson (vocational specialist),

7   both of whom concluded that as of December 2009 (and thus, impliedly June 2009),

8   plaintiff had significant limitations in functionality that precluded her from performing her

9   daily activities – which activities would include the ability to perform the type of upper

10  extremity movements required in plaintiff's daily job.  On the other hand, however,

11  defendant relies on Dr. Kaplan's contrary opinion, which refutes the conclusions reached by

12  Dr. Newkirk and concludes that plaintiff would be able to perform her office functions, if

13  performed with sufficient breaks and accommodations to alleviate the effects/requirements

14  of sitting.  In addition, defendant also relies upon the objective physical evidence provided

15  by the third party surveillance video – which evidence depicts plaintiff performing activities

16  of daily living, such as driving and shopping.

17       Ultimately, the court finds the evidence in the record more strongly supports

18  defendant's position.  In sum, the findings noted by both Dr. Kelly and Dr. Kaplan,

19  combined with the surveillance footage procured by defendant, raises questions that cast

20  doubt upon some of the findings made by plaintiff's supporting doctor, Dr. Newkirk.  The

21  surveillance footage, for example, suggests that plaintiff is not as limited as Dr. Newkirk's

22  work "preclusions" would suggest.  Dr. Newkirk opines that plaintiff is "severely" limited – to

23  15 minute segments, no more than 4 times a day – in doing any kind of reaching, including

24  such as which occurs while driving.  See AR at PRU00623.  Dr. Newkirk also opines that

25  plaintiff is precluded from lifting and carrying more than 3 lbs., with either or both hands,

26  frequently or continuously, and that plaintiff must avoid repetitive turning of the head to

27  either side.  Id.  The surveillance video, however, affirmatively demonstrates plaintiff

28

19

United States District Court

For the Northern District of California

1   driving; sitting for nearly half an hour while talking and turning her head from left to right

2   and up and down; shopping and carrying purses and baskets; and repeatedly grabbing

3   supermarket items off shelves and putting them in her cart. See AR at PRU01202.

4   Furthermore, the administrative record supports the conclusion that, while plaintiff reported

5   pain and inability to use sit for long periods of time and/or to use her upper extremities for

6   repetitive movement, she was also found to have intact muscle strength, no evidence of an

7   underlying neurological condition, and some degree of functional capacity, such that

8   plaintiff was able to sit for as much as 30-60 minute intervals with intervals involving

9   position changes, and perform short periods of upper body motion. See AR at PRU00642,

10  PRU00650, PRU00653, PRU00741-42.  This is consistent with Dr. Kaplan's finding that the

11  medical records do not fully support the degree of impairment reported by plaintiff. See AR

12  at PRU00223-38.

13      Plaintiff tries to dispel any inconsistencies suggested by the surveillance video by

14  stating that some of the activities undertaken in the video were actually prescribed for

15  rehabilitative purposes and disclosed to Prudential, and furthermore, that performance of

16  isolated day to day activities as depicted in the video is not inconsistent with plaintiff's

17  failure to function in regards to the day to day duties of her position.  Plaintiff also contends

18  that Dr. Kaplan's findings were premised on an inaccurate MRI report, and that Dr. Kaplan

19  subsequently and inappropriately changed his findings in recognition of this fact.  However,

20  even taking into account the limited nature of the surveillance video footage, it is

21  nonetheless sufficient, when viewed in connection with other evidence in the record, to

22  support defendant's conclusion that plaintiff's demonstrated functionality was not so severe

23  as to render her unable to perform the material duties of her regular occupation.

24  Furthermore, although plaintiff makes much of Dr. Kaplan's apparent reliance on an

25  outdated MRI report, the court also finds that Dr. Kaplan adequately explained his decision

26  not to rely on the results of an MRI or other radiograph in reaching his opinion, in his

27  October 4, 2010 report. See AR at PRU00226.

28

In sum, the court's review of the administrative record discloses that although plaintiff had a well-documented history of degenerative disc disease and myofascial pain, physical examinations demonstrated intact sensation with respect to plaintiff's muscles and extremities; plaintiff's own doctor and the vocational expert recognized that some degree of functionality was possible, allowing for constant changes in position and intervals between sitting and upper body motion; and that although Dr. Newkirk and Dr. Kaplan disagreed as to the extent of plaintiff's functional limitations, defendant's surveillance casts sufficient doubt on the severity of plaintiff's functional limitations, as reported by Dr. Newkirk, that the work preclusions offered by Dr. Newkirk may reasonably have been doubted.

As a result, the court finds that the evidence cannot support the conclusion that Prudential incorrectly denied benefits. See, e.g., Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).

In view of this finding, it is unnecessary for the court to consider whether plaintiff was also disabled under the "any occupation" provision of the Plan as of May 5, 2010. Even had the court reached this argument, however, it would have found remand of the issue to be appropriate so that Prudential could first consider whether such benefits are appropriate. Unless and until defendant considers entitlement to benefits under the "any occupation" provision, the issue is not ripe for the court to decide whether Prudential wrongfully withheld such benefits.

C.    Conclusion

In sum, and for the foregoing reasons, the court hereby GRANTS defendant's motion for judgment pursuant to Rule 52. Plaintiff's corresponding cross-motion is DENIED.

**IT IS SO ORDERED.**

Dated: May 11, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge

21